```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
DAVID H. SCHEFFER, MARY C. BERGEVIN,
JOSEPH L. STEPHANY, LAURA J.
SWARTZENBERG AND ROSARIO ZOCCO,

                         Plaintiffs,           05-CV-6700

            vs.                                DECISION
                                               and ORDER
THE CIVIL SERVICE EMPLOYEES ASSOCIATION,
LOCAL 828, THE CIVIL SERVICE EMPLOYEES
ASSOCIATION, AFSCME, LOCAL 1000, AFL-CIO
AND AMERICAN FEDERATION OF STATE, COUNTY
AND MUNICIPAL EMPLOYEES, AFL-CIO,

                         Defendants.
_____
```

**<u>INTRODUCTION</u>**

Plaintiffs David Scheffer, Mary Bergevin, Joseph Stephany, Laura Swartzenberg and Rosario Zocco bring this action against defendants Civil Service Employees Association, Local 828; Civil Service Employees Association, AFSCME, Local 1000, AFL-CIO; and the American Federation of State, County and Municipal Employees, AFL-CIO, claiming that the defendants violated their civil rights by unlawfully collecting and distributing union fees in violation of their rights under the First and Fourteenth Amendments to the United States Constitution.  Specifically, the plaintiffs, who are Probation Officers employed by the County of Monroe, New York, have filed a motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

Plaintiffs allege that the defendants seized union fees from the wages of plaintiffs and each member of the class plaintiffs

1

seek to represent, in the absence of the notice and procedural safeguards required by the First Amendment and further that defendants used fees collected from plaintiffs wages and each member of the subclass of objecting nonmembers plaintiffs seek to represent, for non-bargaining activities such as organizing. Plaintiffs also request that their counsel be appointed class counsel under Rule 23(g) of the Federal Rules of Civil Procedure. Defendants oppose the motion mainly on the basis that plaintiffs' attorneys cannot represent the class due to their well known hostility to unions on political and ideological grounds.

After a review of all the motion papers in support of and in opposition to the motion for class certification and for the reasons set forth below, I deny the National Right to Work Legal Defense Foundation's application to be appointed as class counsel under Rule 23(g) of the Federal Rules of Civil Procedure and I defer the decision regarding the motion for class certification until after substitute counsel has been appointed.

## BACKGROUND

Plaintiffs are employed by Monroe County, New York as probation officers. Plaintiffs are "public employees" within the meaning of N.Y. Civ. Serv. Law § 201(7)(a). Plaintiffs are employed in a bargaining unit represented by the Civil Service Employees Association, Inc. ("CSEA"), Local 1000, AFSCME, AFL-CIO, Monroe County Employee Unit, Local 828 ("Local 828"). CSEA is a labor organization that is recognized as the collective bargaining agent for over 200,000 employees in New York state.

Of the employees in the various bargaining units CSEA represents, approximately 91% have become members of the union and thus support the union's representational efforts through their dues payments. The remaining 9% (approximately 18,702 persons statewide) have declined to become union members. Monroe County has recognized CSEA as the exclusive representative, for collective bargaining purposes, in plaintiffs' bargaining unit.

Plaintiffs are required to pay fees to Local 828, CSEA and AFSCME. Both New York state law and federal labor law require that a union certified as exclusive bargaining agent shall fairly and equally represent all employees in the bargaining unit it represents, e.g. through grievance and arbitration process whether or not they are dues-paying members of the union. To help equalize the financial burden of this representation among union members and non-members, New York allows public sector unions to collect an "agency shop fee" in an amount equal to union dues from employees the union is required to represent who choose not to be union members. The New York statute also provides, however, that a union collecting an agency shop fee must maintain a procedure for refunding to any nonmember who so requests the portion of his or her agency shop fee that corresponds to the union's expenses for "activities or causes of a political or ideological nature only incidentally related to terms and conditions of employment."

In deference to the First Amendment non-associational rights of nonmember fee payers, the Supreme Court has ruled that

nonmembers who have an objection to paying for a union's political or ideological activities can only be required to pay a reduced agency fee that excludes the portion of union dues allocated for political and ideological expenditures not relevant to the union's representational function.  In the absence of an objection, therefore, a union may lawfully collect the equivalent of its full dues from the nonmembers it represents.  To ensure that nonmembers are able to make an informed decision on whether to file an objection, the Court has also developed a set of prophylactic procedures that unions must follow in collecting an agency fee, including the requirement that nonmembers be given notice of the basis for the union's calculation of its expenses that are chargeable and non-chargeable to objectors, along with the opportunity to register their objection to paying the non-chargeable portion of the agency fee.

According to defendants, in compliance with these requirements, CSEA annually sends to all nonmembers subject to an agency fee requirement an "agency shop notice" setting forth the union's calculations of its chargeable and non-chargeable expenses and explaining how to register an objection.

Defendants have collected union fees from nonmember employees represented by affiliates of CSEA since November 2002. CSEA receives union fees from non-objecting members and uses fees collected for non-bargaining activities such as organizing. Plaintiffs allege that it is CSEA's responsibility to provide non-union member employees represented by affiliates of CSEA with

notice of their rights in accordance with the law. However, plaintiffs claim they were not provided with the required notice of the nonmember employees' rights.

Until June 2005, all five plaintiffs were and had been since beginning employment, dues-paying members of the union. In that same month, all five submitted very similar letters to CSEA resigning their union membership and requested refunds of that portion of the agency shop fees they would have to pay that corresponded to the union's political and ideological expenses not relevant to its collective bargaining function. Accordingly, plaintiffs were treated as agency fee objectors for the union's 2005-2006 fiscal year and were sent approximately $31.04 on a quarterly basis for the non-chargeable portion of the fees.

Plaintiffs demand not only declaratory and injunctive relief, but also full restitution to all agency fee payers in the state of the full amount of the fees they have paid as well as punitive damages.

## DISCUSSION

### I.  Class Counsel Must Adequately Represent the Interests of the Class

Defendants' argue that plaintiffs' counsel are employees of an organization who's objectives in this and similar litigation is to weaken public-sector unions, which is <u>not</u> in the interests of the employees of those unions they represent (members or nonmembers), but for the principle benefit of the <u>opposing</u> interests of taxpayers. Plaintiffs' counsel, the National Right to Work Legal Defense Foundation (the "Foundation") is pursuing

these claims and remedies that are consistent only with that objective, and not with the interests of many of the class members they seek to represent. Thus, their representation is not free of conflict as required by Rule 23(g)(1), F.R.C.P.

Defendants rely on Gilpin v. AFSCME, 875 F.2d 1310 (7th Cir. 1989) and its progeny. In Gilpin, Judge Posner analyzed the problem presented where, as here, named plaintiffs represented by ideologically motivated attorneys from the Foundation seek to represent a class of all nonunion employees required to pay agency fees. In affirming a district court's denial of class certification, the Seventh Circuit identified an inherent conflict between the type of claim asserted by the Foundation attorneys and the interests of a substantial number of class members who do not share the Foundation's ideological hostility to unions. Judge Posner explained as follows:

> A potentially serious conflict of interest within the class precluded the named plaintiffs from representing the entire class adequately.... Two distinct types of employees will decline to join the union representing their bargaining unit. The first is the employee who is hostile to unions on political or ideological grounds. The second is the employee who is happy to be represented by a union but won't pay any more for that representation than he is forced to. The two types have potentially divergent aims. The first wants to weaken and if possible destroy the union; the second, a free rider, wants merely to shift as much of the cost of representation as possible to other workers, i.e., union members. The "restitution" remedy sought by the National Right to Work Legal Defense Foundation, which represents the nine named plaintiffs, is consistent with-and only with-the aims of the first type of employee.

Id. at 1313. Thus, the court opined that "[t]he National Right to Work Foundation is not an adequate litigation representative"

6

of employees "who, while not wanting to pay more (and perhaps even wanting to pay less) than their 'fair share' fees, have no desire to ruin the union or impair its ability to represent them effectively...." Id.; See also Kidwell v. Transp. Comm. Int'l Union, 946 F.2d 283, 305-06 (4th Cir. 1991) ("We agree with the Seventh Circuit.  The plaintiffs, once again represented by the National Right to Work Legal Defense Foundation, are not adequate representatives under Rule 23"); Weaver v. Univ. of Cincinnati, 970 F.2d 1523, 1530-31 (6th Cir. 1992).

   I agree with the defendants that Gilpin is applicable here. The Foundation's real objective is political notwithstanding its claimed objective of being a "charitable public interest, legal aid organization."  See Milton Chappell Declaration ("Chappell Decl."), ¶ 2.  In fact, as the Foundation's president stated in a confidential internal memorandum produced in discovery "I realize that, as a charitable entity, we are constrained to activities which can be defended as charitable.  However, I believe our real aim is dedicated to "reducing union political influence over society." See Declaration of John West ("West Decl."), Ex. A. The Foundation is dedicated to "reducing union political influence over society." See West Decl., Ex. B, p.4. The Foundation's manner of pursuing this objective is by triggering legal attacks that seek to impair the ability of unions to collect agency fees from nonmembers whom they represent in collective bargaining in what the Foundation describes as

7

"forced unionism."[1]  Id.

    The Foundation's fund-raising correspondence illustrates how the organization plans to use the judicial process to further its agenda.  For instance, in an April 2001 letter to its supporters, the Foundation states that:

> National Right to Work Foundation attorneys are making big strides with a strategy that can take huge bites out of the union bosses' illegal amassed power.
>
> <u>A strategy that – IN A SINGLE COURT CASE – frees hundreds, thousands, sometimes tens of thousands of workers</u> from Big Labor's clutches.
>
> <u>A strategy that – IN A SINGLE COURT CASE – forces union fat cats to return millions of illegally seized dollars</u> to workers (and often pay a portion of your Foundation's legal expenses!)
>
> What is the strategy?
>
> Class-action lawsuits.

<u>See</u> Alexander Decl., Ex. B., p.1. (emphasis in original).  In pursuing its strategy of opposing union influence through class action lawsuits, the Foundation views its mission as taking on "[t]he unions' attorneys and judges who are frequently beholden to union political power [and] will continue to abuse the rights of workers."  <u>See</u> West Decl., Ex. B., p.4.  The Foundation's literature clearly demonstrates its forceful campaign against unionization in the public sector.  Indeed, the literature states that its goals are to help keep taxes down by making it more difficult for unions to resists privatization of public sector

---

[1] The Foundation's fund-raising literature states that "[n]o other national legal organization focuses exclusively on dismantling forced unionism - the engine that drives the far-left political machine."

employment and otherwise protect public employees' wages and jobs.  The Foundation indicates that "government in a non-Right to Work state is 55.6 percent more expensive and the taxpayer burden is $592 higher (per capita) than in a Right to Work state."[2]  See Alexander Decl., Ex. D., p. 69.  Thus, "<u>taxpayers like you and me</u>" are left "<u>to soak ... and ... soak and soak.</u>"  See Alexander Decl., Ex. C, p. 1 (emphasis in original).

Consequently, the objective of the Foundation in its public sector cases is to "<u>free all American citizens and taxpayers (not just employees) from the evil effects of union abuse</u>," and as a result "strik[e] a blow for taxpayers everywhere."  See Alexander Decl., Ex. C, p. 5 (emphasis in original).  Indeed the Foundation informs its contributors that the "<u>Foundation attorneys can break the back of Big Labor's government employee forced-dues empire</u> ...."  Id. (emphasis in original).  To succeed in this endeavor, Foundation lawyers claim they are ready to methodically exert utmost pressure on Big Labor by "<u>[s]lam[ming] into union bosses with class action lawsuits</u>" and "<u>[s]eek[ing] precedent-setting punitive damages.</u>"  Id. at p.4 (emphasis in original).

---

[2] The Foundation explains the higher cost of government services in state where agency fees are prohibited as follows: By taking over local, state, and federal workers, Big Labor:

- <u>Rakes in hundreds of millions of dollars in forced dues</u> from civil servants to dump into radical Tax-and-Spend politics.
- <u>Blocks government reforms</u> that improve services and save taxpayers money ... especially privatization....
- <u>Drives up taxes and busts budgets</u>.  Already bloated government spending skyrockets as politicians scramble to pay off their union-boss masters.

See Alexander Decl., Ex. C, p. 3 (emphasis in original).

In accordance with its goals, the Foundation attorneys have commenced this action against CSEA and its affiliates. The legal issues on which this lawsuit is based are narrow, i.e. whether organizing expenditures are chargeable, and whether separate breakdowns are required for CSEA's expenditures on rebates to its local subdivisions. However, the relief sought is broad i.e. an order for full <u>restitution</u> to all fee payers of the entire agency fee they paid in the relevant year(s) - including portions of the fee that are undeniably chargeable even to those fee payers who object to paying for expenditures unrelated to the union's collective bargaining function. Such a remedy has been described as punitive in nature.[3] <u>See</u> <u>Gilpin</u>, 875 F.2d at 1315 (Court held plaintiffs sought severely punitive remedy and not one properly described as restitution).

Here, the Foundation attorneys' motives are even more apparent since they seek not only the punitive remedy of restitution but also the actual remedy of punitive damages. The defendants claim that class counsel "must serve the interests of the entire class," and that the Foundation attorneys do not meet that requirement. <u>See</u> Fed. R. Civ. P. 23(a)(4). In <u>Gilpin</u>, Judge Posner stated that the "'restitution' remedy sought by the National Right to Work Legal Defense Foundation is consistent with those union members who are hostile to unions on political and ideological grounds but inconsistent with those union members

---

[3] As seen from some of the deposition testimony, the named plaintiffs were unaware that the Foundation attorneys were going to seek restitution remedy for the full agency fee. See Stephany Dep. 41-411 Swartzenberg Dep. 23-24; Zocco Dep. 40-41; Scheffer Dep. 32 and Bergevin Dep. 35.

who are happy to be represented by a union but won't pay any more for that representation than he is forced to." See Gilpin, 875 F.2d at 1313. As a result, these two groups have divergent claims. Thus, Gilpin correctly holds that a demand for full restitution of fees creates a conflict of interest within the putative class because the demand is so adverse to the interests of employees who do not wish to "weaken and if possible destroy the union." Gilpin, 875 F.2d at 1313. The choice of remedies and legal claims the Foundation has opted to bring mirrors its resolve of "break[ing] the back" of public-sector unions and undermining their ability to seek improvement of wages and benefits of the public-sector workers they represent.

Moreover, as defendants have shown, the Foundation seeks to use public employees who are not union members as pawns in litigation that is being conducted in the interest of taxpayers, with the ultimate purpose of denying unions the funds they need to advance the interests of those very nonmembers plaintiffs purport to represent. These actions clearly reveal the type of conflict of interest described by Judge Posner in Gilpin. The Foundation has demonstrated that its aim in commencing class action lawsuits similar to this case is to defend the interests of the taxpayers who are forced to pay those public employees' salaries and benefits by weakening the ability of unions to achieve gains for public sector employees that entail costs to taxpayers, and making it harder for unions to resist privatization of public-sector jobs including those of the class

11

members the Foundation seeks to represent here.  See Alexander Decl., Ex. C pp. 3-4.

## II. The Foundation's Mission Conflicts with Plaintiffs' Interests in This Case

Rule 23(g) guides the court in determining whether counsel is qualified to serve to represent the class.  Fed. R. Civ. P. 23(g). It responds to the reality that the selection and activity of class counsel are often critically important to the successful handling of a class action. This subdivision recognizes the requirement of undivided loyalty of class counsel, states the obligation to represent the interests of the class, and provides a framework for selection of class counsel.  Paragraph 1(B) recognizes that the primary responsibility of class counsel, resulting from appointment as class counsel, is to represent the best interests of the class.  See 2003 Amendments to Advisory Committee Notes of Rule 23(g)(1)(C).  The rule establishes the obligation of class counsel, an obligation that may be different from the customary obligations of counsel to individual clients. Id.  Thus, after review of all applicants, "if the court concludes that none would be satisfactory class counsel, it may deny class certification, reject all applications, recommend that an application be modified, invite new applications, or make any other appropriate order regarding selection and appointment of class counsel." Id.

Here, the plaintiffs are represented by Milton L. Chappell and John R. Martin, staff attorneys employed by the Foundation. The Foundation exists for the purpose of assisting workers whose

12

rights are "violated by compulsory unionism." See West Decl., Ex. F. The Foundation attorneys insist that they will fairly and adequately represent the interests of the plaintiffs and the putative class. See Chappell Decl. ¶ 4; Martin Decl. ¶ 4. Foundation counsel argue that they should be appointed class counsel since it has been held that attorneys employed by legal aid organizations may serve as class counsel. Further, Foundation attorneys have sworn that they will exercise independent judgment in conducting this litigation and will base decisions on best interest of clients and not the Foundation since they are bound by same rules of procedure and conduct as are all counsel in federal court. See Chappell Decl. ¶¶ 4-6 and Martin Decl. ¶¶ 4-6.

Defendants object to their appointment as class counsel and allege that the Foundation is well know for its hostility to unions on political and ideological grounds, which drives their demand for punitive remedies being requested in this case. See Defendants' Memo at p. 22. Defendants' argue that plaintiffs' counsel are employees of an organization that admits that its objectives in this and similar litigation is to weaken public-sector unions and to do so not in the interests of the employees those unions represent (members or nonmembers), but in the opposing interests of taxpayers. Plaintiffs' counsel and its employer are pursuing these claims and remedies that are consistent only with that objective, and not with the interests of many of the class members they seek to represent.

Based on the documents produced in this litigation and

notwithstanding Foundation counsels' arguments to the contrary, it is clear that Foundation attorneys are not able to separate themselves from the Foundation and its ideological agenda. For instance, the Foundation tells its contributors that it is sending "Foundation attorneys" into battle to "break the back of Big Labor's government employee forced-dues empire" and to "strik[e] a blow for taxpayers everywhere." See Alexander Decl., Ex. C. p. 5. Moreover, the non-lawyer Foundation personnel have influence over litigation strategy and case management of these actions. Indeed, Foundation counsel and the non-lawyer staff, specifically its public relations department, work closely together to utilize the Foundation's litigation program to advance the Foundation's institutional interests in publicity and fund-raising. See West Decl., Ex. D, E, and F.[4]

Notwithstanding the Foundation attorneys assurances, this Court remains unconvinced of their undivided loyalty to the plaintiffs and the putative class. The goals of Foundation counsel conflict with the very foundational objectives of the CSEA. As discussed above, the basis for the class action, which is to seek a refund of a portion of the plaintiffs' union dues used for political or ideological purposes, is inconsistent with the Foundation's goal in pursuing its strategy of weakening public employee union influence through class action lawsuits.

---

[4] For example, Foundation attorneys are under strict instructions to coordinate their filings with the Foundation's public relations department. They are also required to use what the Foundation prescribes as ideologically correct language in their legal papers in order to comply with the instructions of their employer, the Foundation.

14

See Alexander Decl., Ex. B. The saving grace of the Foundation attorneys' argument is that they wish to protect union members against the abuses imposed upon them by union political power. Of course, this goal benefits the public because, as the Foundation has stated, "in the past two decades, government union ranks have more than doubled..." the consequence of which is "... higher taxes" and "run away government spending." Accordingly, the benefits of a class action allowing for limited recovery of a portion of the union dues used for political or ideological purposes is collateral to the Foundation's stated goals, which are anti-union and limit government employee unions from growth and pursuing legitimate collective bargaining on behalf of the union membership.

Thus, Foundation counsel are clearly in conflict with the objectives of the plaintiffs and the putative class and cannot act in their best interest. See Runion v. U.S. Shelter, 98 F.R.D. 313, 318 (D.C.S.C. 1983) (Under rule determining class actions, district court acts as fiduciary who must serve as guardian of rights of absent class members even prior to certification).

### III. Appointment of Substitute Counsel and Deferral of Motion for Class Certification

Because I determine that the Foundation attorneys cannot act in the best interests of the plaintiffs and the putative class, the remaining motion for class certification is held in abeyance until the putative class is represented by substitute counsel. See Sterling v. Envtl. Control Bd. of the City of NY, 793 F.2d 52, 58 (2d Cir. 1986) (Whether a case should proceed as a class

action is "peculiarly within the discretion of the trial judge") (quoting <u>Becker v. Schenley Indus., Inc.</u>, 557 F.2d 346, 348 (2d Cir. 1977); <u>see</u> <u>also</u> <u>Sarino v. Computer Credit, Inc.</u>, 173 F.R.D. 346, 351 (E.D.N.Y. 1997).  Pursuant to Rule 23(g), I appoint Michael Harren, Esq. of the Chamberlain D'Amanda law firm of Rochester, New York to act as class counsel.  I further direct Mr. Harren to meet and consult with named plaintiffs regarding his representation of their interests and the interests of the putative class in this case.  Mr. Harren shall report back to the Court within 20 days from the date of this Order whether or not an attorney-client relationship can be established with the class members. If so, the Court will entertain any motions that plaintiffs determine are necessary to proceed with the lawsuit.

## **CONCLUSION**

Upon consideration of plaintiffs' motion for class certification and appointment of class counsel as well as defendants papers submitted in opposition to the motion, and plaintiffs' reply to the opposition, it is hereby ORDERED as follows:

1)   The National Right to Work Legal Defense Foundation's application for appointment as class counsel under Rule 23(g) of the Federal Rules of Civil Procedure is denied;

2)   Plaintiffs' motion for class certification is held in abeyance until the putative class is represented by substitute counsel;

3)   Pursuant to Rule 23(g), I appoint Michael Harren, Esq.

of the law firm of Chamberlain D'Amanda of Rochester, New York to act as class counsel. Mr. Harren is further directed to meet and consult with the named plaintiffs regarding his representation of their interests and the interests of the putative class in this case;

    4)   Within 20 days from the date of this Order Mr. Harren shall report back to the Court whether or not an attorney-client relationship can be established with the class members. If so, the Court will entertain any motions that the plaintiffs determine are necessary to proceed with this lawsuit.

    ALL OF THE ABOVE IS SO ORDERED.

                              s/Michael A. Telesca
                              MICHAEL A. TELESCA
                         United States District Judge

Dated:    Rochester, New York
            October 24, 2006