UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
DAVID H. SCHEFFER, MARY C. BERGEVIN,
JOSEPH L. STEPHANY, LAURA J.
SWARTZENBERG AND ROSARIO ZOCCO,

                          Plaintiffs,              05-CV-6700

              vs.                                  **DECISION
                                                   and ORDER**

THE CIVIL SERVICE EMPLOYEES ASSOCIATION,
LOCAL 828, THE CIVIL SERVICE EMPLOYEES
ASSOCIATION, AFSCME, LOCAL 1000, AFL-CIO
AND AMERICAN FEDERATION OF STATE, COUNTY
AND MUNICIPAL EMPLOYEES, AFL-CIO,

                          Defendants.
_____

## <u>INTRODUCTION</u>

Plaintiffs David Scheffer, Mary Bergevin, Joseph Stephany, Laura Swartzenberg and Rosario Zocco bring this action against defendants Civil Service Employees Association, Local 828; Civil Service Employees Association, AFSCME, Local 1000, AFL-CIO; and the American Federation of State, County and Municipal Employees, AFL-CIO, claiming that the defendants violated their civil rights by unlawfully collecting and distributing union fees in violation of their rights under the First and Fourteenth Amendments to the United States Constitution.

Plaintiffs have filed a motion for summary judgment claiming that there is no dispute as to any of the materials facts and thus plaintiffs are entitled to judgment as a matter of law. Specifically, plaintiffs allege that the defendants seized union fees from the wages of plaintiffs, in the absence of the notice and procedural safeguards required by the First Amendment as set forth in <u>Teachers Local No. 1 v. Hudson</u>, 475 U.S. 292 (1986) and further that defendants used fees

collected from plaintiffs' wages for non-bargaining activities such as organizing. Defendants have also filed a motion for summary judgment arguing that none of the plaintiffs' claims, which consist of the chargeability claim against the unions and the <u>Hudson</u> notice claim, have any merit. According to defendants, there is no dispute as to any of the material facts and as such they are entitled to judgment as a matter of law.

After a review of all the motion papers in support of and in opposition to the motions for summary judgment and for the reasons set forth below, I grant the defendants' motion for summary judgment and deny the plaintiffs' motion for summary judgment.

**BACKGROUND**

### I.   **The Parties**

Plaintiffs are employed by Monroe County, New York as probation officers. Plaintiffs are "public employees" within the meaning of N.Y. Civ. Serv. Law § 201(7)(a). Plaintiffs are employed in a bargaining unit represented by the Civil Service Employees Association, Inc. ("CSEA"),[1] Local 1000, AFSCME, AFL-CIO, Monroe County Employee Unit, Local 828 ("Local 828"). Each of the defendants is an "employee organization" within the meaning of N.Y. Civ. Serv. Law § 201(5). CSEA is a labor organization that is recognized as the collective bargaining agent for over 200,000 employees in New York State. The total includes 76,000 state government employees, 112,000 local government employees and 4,300 private-sector employees. CSEA negotiates its collective bargaining

---

[1] CSEA is the exclusive bargaining representative for the bargaining unit in which each of the plaintiffs is a member. CSEA, Local 828 and AFSCME provide services to the members of the bargaining unit in which each of the plaintiffs is a member. CSEA is an affiliate of AFSCME and is recognized as Local 1000 of AFSCME.

agreements ("CBA"s) with approximately 900 employers across New York State. CSEA's members are employed in a variety of industries and hold various occupations including laborers, lawyers, nurses aides, doctors, accountants, and zoo keepers. In addition, CSEA has nearly 1,300 local administrative subdivisions[2] - approximately 375 "locals" and more than 900 "units," which are subdivisions of the locals. In fact, CSEA Local 828 is one of the approximately 375 locals of CSEA.[3]

Plaintiffs resigned their union memberships in June 2005[4] by sending a letter to CSEA and simultaneously objected to paying for the defendants' non-bargaining-related activities.[5] In the letter, each plaintiff objected to paying fees for "any purpose other than [his/her] pro rata share of the union's costs of collective bargaining, contract administration, and grievance adjustment."

## II.  <u>Process Concerning The Agency Fee</u>

Under New York law, employers collect from all nonmembers and remit to CSEA an agency fee equivalent to full union dues. It is CSEA's policy to dispatch its agency shop notice to all nonunion members on an annual basis. The 2005-2006 Agency Shop Notice was mailed on May 10, 2005 to all

---

[2]CSEA's administrative subdivisions perform the basic day-to-day representation and services for its bargaining unit members, including processing grievances, handling disciplinary matters, engaging in various labor-management relations, arranging for education and training, monitoring safety and health, along with other tasks necessary to administer CBAs and to protect the terms and conditions of employment for bargaining unit members.

[3]CSEA's regions, locals, and units have their own budgets, presidents, and treasurers.

[4]Scheffer sent his resignation letter from CSEA on or about June 1, 2005.  On or about June 3, 2005, Scheffer received a copy of CSEA's agency shop notice.

[5]Stephany became a member of CSEA in 1993 when he began his employment at the Monroe County Sheriff's Department ("MCSD"). Zocco became a member of CSEA in 1997 when he began working for the MCSD. Swartzenberg became a member of CSEA in 2000 when she began her employment at the MCSD. Bergevin became a member of CSEA in 1998 when she began her employment at the MCSD. Scheffer became a member of CSEA in 1997 when he started at the MCSD.

bargaining-unit members who as of that date were nonmembers of the union.[6] The agency shop notice sets forth CSEA's and AFSCME's calculations of their expenditures that are chargeable and non-chargeable to agency fee payors who object to paying for the union's activities that are not germane to collective bargaining.[7] As outlined in the agency shop notice, CSEA allocates expenses as chargeable if the expense is in connection with "the collective bargaining process, contract administration and pursuing matters affecting wages, hours and other conditions of employment." See Ex. 19 to Defendants' 2/2/07 Appendix. For the 2005-2006 agency shop notice, CSEA used the actual expenditures for the fiscal year ending September 30, 2004, which was the most recent fiscal year for which data was available. The agency shop notice includes a report from CSEA's independent accountant who annually provides CSEA with an outside opinion as to the financial statements of CSEA and reviews CSEA's allocation of expenses as chargeable and nonchargeable.

In the 2005 agency shop notice, the chargeable percentage of CSEA's expenditures for the 2005-2006 fiscal year was 77% and the nonchargeable percentage was 23%. Expenditures for CSEA's publications are allocated by determining the portions of the publications' content dealing with chargeable and nonchargeable issues. Expenditures for CSEA's conventions and meetings are allocated between chargeable and nonchargeable categories by reviewing the agenda for the convention and allocating any portion of the agenda that is political or ideological in nature to the

---

[6]In June 2005, the defendants provided Scheffer with the CSEA agency shop notice. The defendants did not provide the CSEA agency shop notice for 2005-2006 to Bergevin, Stephany, Swartzenberg or Zocco. In July 2006, the nonmembers all received the 2006-2007 CSEA agency shop notice.

[7]The amount of the agency fee for objecting non-union members is calculated by determining the ratio of chargeable expenses to total expenses.

nonchargeable category. If insufficient information is available to determine the content of a particular convention or meeting, CSEA allocates all of the expenses to the nonchargeable category. Moreover, CSEA allocates the expenditures for support or administration services by using the overall chargeable and nonchargeable percentages calculated for CSEA's program departments.

Plaintiffs argue that CSEA does not provide to its nonmembers audited financial disclosures of the breakdown between chargeable and nonchargeable expenses for the CSEA local affiliates and/or subdivisions that receive money collected from the plaintiffs. Defendants claim that while CSEA's agency shop notice does not include specific information on the expenditures of CSEA's local affiliates, it relies on a presumption that the audited expenditures CSEA makes as rebates to the local administrative subdivisions are used for chargeable activities to at least the same extent as CSEA's other expenditures. For the fiscal year ending September 30, 2004, CSEA's local affiliates had expenses in excess of $10 million. For the fiscal year ending September 30, 2005, CSEA's local subdivisions had expenses in excess of $12 million.

The 2005-2006 CSEA agency shop notice states that $2,155,019 of organizing expenses were chargeable and $114,642 of organizing expenses were non-chargeable. The 2006-2007 CSEA agency shop notice states that $2,214,037 of organizing expenses were chargeable and $119,765 of organizing expenses were non-chargeable. CSEA calculates that its organizing expenses are partially chargeable to objecting non-union members.

In addition, CSEA administers a Political Action Trust Fund, which

is a separate entity from CSEA and which has expenses that include direct contributions to candidates, education of members on political activities, providing information to members and the general public regarding politics, and payroll for the staff of the Trust who provide these services. The Trust receives 3% of the dues and fees collected by CSEA from its members and non-objecting fee payors. CSEA treats these expenditures as entirely nonchargeable. Another expense is affiliation dues by CSEA to AFSCME. CSEA allocates that expenditure between chargeable and noncharegeable categories "based on the most recent allocation calculations for AFSCME." At the time CSEA complied with its 2005 agency shop notice, the most recent allocation determined that 66% of AFSCME's total expenses were chargeable. Regarding this expense, the agency shop notice includes a report from AFSCME's independent accountant who provides AFSCME with an outside annual opinion as to the financial statements of AFSCME and reviews AFSCME's allocation of expenses as chargeable and noncharegeable.

Another type of expense is the "rebates" that CSEA provides to its local subdivisions, which enable those subdivisions to operate. CSEA's rebates to its subdivisions are also allocated between chargeable and noncharegeable categories. CSEA sends an advance rebate check to the nonmembers on a quarterly basis that amounts to the difference between full union dues and the agency fee objector amount.

Further, CSEA has mandated uniform constitutions for its local subdivisions. Each mandated constitution contains an article entitled "Political and Ideological Endorsements and Expenditures," which prohibits any local subdivision from endorsing "any candidate for

political or party office or any proposition on behalf of CSEA." <u>See</u>
Sullivan Aff. at ¶ 26. The "Political and Ideological Endorsements and
Expenditures" section of the mandated constitution also provides that

> No member or officer of [a local subdivision] shall make, or
> cause the [local subdivision] to make, either directly or
> indirectly, any expenditure, reimbursement or contribution of
> any kind from union funds or property for political or
> ideological purposes, nor may the [local subdivision] make any
> loans or incur any indebtedness for such purposes.

<u>See</u> <u>Id.</u> CSEA has also adopted a Financial Standards Code in order to
"establish minimum standards to be met by [CSEA's subdivisions] in the
handling of funds and other assets ... and in the maintenance of
financial records." <u>See</u> <u>Id.</u> at ¶ 27. The Financial Standards Code
provides that "[n]o contributions may be made or any expenses incurred
by the subordinate for any political cause." <u>See</u> CSEA Financial Standards
Code, Art. VI, § 4(a).

In addition, CSEA's statewide treasurer sends an annual notice to
CSEA's local subdivision and/or affiliate notifying them of CSEA's
allocation of chargeable and nonchargeable expenses and instructing them
not to exceed the nonchargeable percentage obtained in the annual notice.
In order for a local affiliate to obtain a rebate from CSEA, the
affiliate must file forms with CSEA proving that they have complied with
annual reporting requirements and budgets mandated by the constitution
and Code of Financial Standards. To review for compliance with the
nonchargeable percentage limitation, CSEA's Department of Internal
Operations audits the local subdivisions on a random basis and reports
whenever inconsistencies appear in the budgeting and reporting forms
submitted by each subdivision to CSEA. CSEA's Statewide Treasurer also
conducts training on financial requirements for the treasurers of CSEA's

local subdivisions. This training includes instruction on complying with the limits set forth in the agency shop notice.

Defendants argue that because of the nature of activities in which CSEA's local affiliates engage, the prohibition on their use of any funds for political purposes, and the limitation on their funds for other nonchargeable purposes, CSEA's use of the "local presumption" to calculate the chargeable percentage of its expenditures for rebates to the local subdivisions understates the actual chargeable percentage of those expenditures. Plaintiffs dispute this statement and argue that defendants cannot know whether the use of the "local presumption" understates the actual chargeable percentage of CSEA's expenditures because CSEA does not obtain independent audits of the local subdivisions' expenditures.

### III. <u>Objection to and Challenging the Allocation of Expenditures</u>

The agency shop notice explains to nonmembers how to register an objection to paying the portion of the agency fee that corresponds to the union's nonchargeable expenditures or to challenge the union's calculation of the chargeable percentage before an independent arbitrator. In order to object to paying the portion of the agency fee that corresponds to the union's nonchargeable expenditures for the 2005-2006 fiscal year, nonmembers were required to "file written notice of his [or her] objection with the CSEA Treasurer ... in the period from May 10, 2005 to June 10, 2005." <u>See</u> Defendants' Ex. 19. For the 2006-2007 fiscal year, nonmembers were required to "file written notice of his [or her] objection with the CSEA Treasurer ... in the period from June 15, 2006 to July 15, 2006." <u>See</u> Plaintiffs' Ex. A to Scheffer Declaration. Members

who miss the deadline to object waive the right to object to payment of the nonchargeable portion of the agency fee. See id.

In July 2006, plaintiffs all objected to paying for the defendants' non-bargaining-related activities. Defendants state that once an objection is received in a timely manner, CSEA issues quarterly advance payments to the objector of the portion of the agency fee that corresponds to the nonchargeable percentage of CSEA's expenditures. Plaintiffs argue that CSEA is charging the nonmembers for organizing, which the nonmembers claim is not chargeable.

IV.  **Organizing Efforts**

CSEA's organizing efforts focus primarily on organizing private-sector employees in the developmental disabilities field and in the food and courier services industry. CSEA also seeks to organize employees in the public sector who are not covered by a CBA. Defendants claim that the nonunionized employees in all of these industries perform work similar to the work performed by CSEA's bargaining unit members and are competing with CSEA's bargaining unit members for employment opportunities in those industries. Plaintiffs argue that since they are probation officers, the employees in the developmental disabilities field and in the food and courier service industry are not in competition with them for employment opportunities. For a number of years, the State of New York and many local governments have engaged in efforts to privatize or contract out services that had previously been performed by public-sector workers, many of whom had been part of CSEA bargaining units. Indeed, the overwhelming majority of the employers to whom the governments contracted out such work are not unionized. A primary focus of CSEA's organizing

9

efforts is to stop the loss of jobs of employees represented by CSEA and to protect the wages and benefits of those employees from declining due to the presence of unorganized and lesser paid employees in the private sector.

When the efforts of public-sector employers in New York State to privatize or contract out these services initially began, CSEA did not attempt to organize the non-unionized employees, believing that the efforts to privatize would be unsuccessful, that these efforts were only part of a short term trend, and that there would be no appreciable impact on the wages, benefits, working conditions, or employment opportunities of CSEA's bargaining unit members. However, CSEA recognized that these assumptions were wrong. CSEA has since concluded that where it fails to organize the nonunionized employees operating in the same industry or market as the employees it represents, its ability to negotiate favorable wages, benefits, and working conditions for its bargaining unit members has declined and will continue to decline, and the incentive to privatize and contract out work will continue to increase.[8]

For instance, the private-sector employees in the developmental disabilities field receive lower wages and lesser quality and more expensive retirement and health benefits (a difference of nearly $15,000 a year per employee) than do the public-sector employees represented by CSEA. The New York State Senate estimated that it would cost $834 million per year to bring the wages and benefits of the private sector employees in the developmental disabilities field substantially closer to the wages

---

[8]There are approximately 66,000 employees working for the private-sector employers in the developmental disabilities field. The State of New York also employs 16,000 CSEA bargaining unit members to provide services to individuals with developmental disabilities.

and benefit level of CSEA-represented employees. Beginning around 2000, the New York State agency overseeing the developmental disabilities industry began to direct nearly all of the growth and expansion in the services for individuals with developmental disabilities to the private sector.[9] Further, the State began an effort to "turnkey" control of and responsibility for operating facilities operated by public-sector employees to these lower cost, private-sector employers. When the government "turnkeys" a facility, the bargaining unit members previously working at that facility either lose their jobs, become employees of the new private-sector employer, or transfer to other vacancies in the public-sector system. However, the public-sector, bargaining unit position would be eliminated and replaced by a position that received lower pay and fewer but higher cost benefits.

CSEA's organizing efforts in the developmental disabilities field have been successful, leading to roughly two thousand private-sector employees in this field choosing CSEA as their exclusive bargaining representative. CSEA also focuses its organizing activities on those employees working at public facilities (such as schools, hospitals, or jails) who provide services, including food and courier services that have been contracted out to private-sector employees. When these bargaining unit positions were contracted out, the public-sector employees who held those positions either lost their jobs, became employees of the private-sector employer and faced a corresponding decrease in wages and benefits, or transferred to a vacancy in the

---

[9] Since 2000 New York State, as part of the New York CARES program, has funded the creation of 5,000 additional beds for these individuals. Of these 5,000 beds, 4,900 of them went to the private sector. By contrast, only 100 beds went to the public sector.

public-sector system. The public-sector bargaining unit position, however, was eliminated and replaced by a private-sector position that provides lower pay and fewer benefits than CSEA has negotiated for its bargaining unit members who perform similar work in the same industry. Because of the lower wages, benefits and employer costs of these private-sector operations, CSEA concluded that organizing such contracted-out private-sector workplaces is essential in order to protect the jobs, wages and benefits of CSEA-represented public-sector employees.

In addition to organizing campaigns in the private-sector, CSEA also organizes employees in the public-sector who are not covered by a CBA. One goal of CSEA's public-sector organizing campaigns is to discourage the public-sector employers from moving work from organized positions within CSEA's bargaining unit to unorganized positions with a corresponding decrease in the wages and benefits for the affected employees. In many school districts, temporary or part-time employees are not organized. The wages and benefits of these part-time, non-unionized employees are substantially lower than the corresponding wages of CSEA-represented employees. CSEA has seen public-sector employers attempt to replace many full-time positions with part-time work, resulting in the substantial erosion of the wages, benefits, and job security of those employees in the CSEA bargaining unit. CSEA negotiators have repeatedly been told that wages for their bargaining unit members must be reduced or held constant because of the higher labor costs of an organized workforce.

As examples, in negotiations CSEA had with the South Glenn Falls School District, the employer, because of the wage and benefit levels of

non-unionized employers, proposed limiting the size of the wage increase while at the same time increasing employee health care contributions. At a Headstart program in Saratoga, New York, funding was denied because the program's wages were not consistent with the surrounding neighborhood. Funding was restored only when the pay of CSEA's bargaining unit members at the facility was reduced. In negotiations between CSEA and the Town of Moreau, the town supervisor proposed, based on comparisons to employers in the private sector, a reduction in the starting salary for employees and an increase in employee contributions for health care benefits.

Defendants' expert witness, Dr. Dale Belman, along with two co-authors published a study finding that "increased organization of public employees resulted in higher wages for represented employees," ranging from 1.5 to 2.8% for local government employees and 4.1 to 6.9% for state government employees for each 10 percentage point increase in union density. See Defendants' Ex. 33. Studies of the impact of union density on wages of employees covered by a collective bargaining agreement in the private sector have found that a 10 percentage point increase in union density increases wages "between 1.1 and 4.5 percentage points, depending on the precise group of workers, the time period, and the other factors controlled for in the particular [study]." Id.

## DISCUSSION

### I.   Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment as a matter of law only where, "the pleadings, depositions, answers to interrogatories and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . ." F.R.C.P. 56(c) (2003). The party seeking summary judgment bears the burden of demonstrating that no genuine issue of material fact exists, and in making the decision the court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. <u>Ford v. Reynolds</u>, 316 F.3d 351, 354 (2d Cir.2003) (<u>citing</u> <u>Marvel Characters v. Simon</u>, 310 F.3d 280, 285-86(2d Cir.2002)). "Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." <u>Id.</u>

In suits alleging the deprivation of constitutional rights, summary judgment is often inappropriate, especially prior to the completion of full discovery. <u>See</u> <u>generally</u> 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2732.2 (1983). However, if the factual background relevant to the constitutional issue is not contested and the legal issue is clearly presented, summary judgment under Rule 56 is appropriate. <u>See</u> <u>Andrews v. Education Ass'n of Cheshire</u>, 653 F.Supp. 1373 (D.Conn. 1987) (granting defendant's motion for summary judgment in First Amendment/Hudson action), aff'd, 829 F.2d 335 (2d Cir.1987); <u>see</u> <u>also</u> <u>Pinckney v. United States</u>, 671 F.Supp. 405, 408 n. 3 (E.D.N.C.1987) ("if the court is satisfied that a sufficient record has been developed [so] that there remains no genuine issue of fact, ... a defendant's motion for summary judgment [may] be granted").

## II.  <u>Local Union Presumption</u>

In <u>Hudson</u>, the Court established the minimum procedures consistent with the constitution that a union must follow in order to distinguish

between those union activities sufficiently related to collective bargaining to warrant requiring nonunion members to pay their fair share and those union activities whose cost must be borne solely by union members. See Teachers Local No. 1 v. Hudson, 475 U.S. 292 (1986). The Hudson court enumerated these necessary procedures to be followed in order "to draw that necessary line and to respond to nonmembers' objections to the manner in which it was drawn." See Hudson, 475 U.S. at 294. The instant litigation requires the application of the Court's decision in Hudson to the defendants' procedure for determining its agency fee. In Hudson, the Court held, inter alia, "that the constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee...." Id. at 310. Further, the court held that a union collecting an agency fee must provide its nonmember feepayers with "sufficient information to gauge the propriety of the union's fee." Id. at 306.[10]

Plaintiffs argue that defendants have violated Hudson since the nonmembers receive no separate audit for the local unions that receive and spend nonmembers' money in the agency shop notice. See Plaintiff's 1/17/07 Memo at 5. Consequently, plaintiffs contend that no adequate disclosure is provided regarding expenditures made by CSEA's local unions. Id. Moreover, plaintiffs assert that the "local union

_____

[10]The Court elaborated on this requirement as follows:

We continue to recognize that there are practical reasons why "[a]bsolute precision" in the calculation of the charge to nonmembers cannot be "expected or required." ... The Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor. Id. at 307 n. 18 (quoting Railway Clerks v. Allen, 373 U.S. 113, 122 (1963)).

presumption" should not be permitted.[11] Specifically, plaintiffs contend that the local union presumption creates a problem where the local union is spending money collected from nonmembers, and that spending is never audited. The end result, plaintiffs argue, is that the nonmembers are not given "information sufficient to gauge the propriety of the fee." See Hohe v. Casey, 956 F.2d 399 (3d Cir. 1992).

Defendants disagree and assert that consistent with the requirements in Hudson, it is acceptable that a union collecting an agency fee must determine the percentage of its union dues that is chargeable to objecting feepayers (typically by calculating the percentage of the union's expenditures in a prior year allocated for "chargeable" and "nonchargeable" activities) and that the union must provide nonmembers with an "adequate explanation of the basis for the fee." See Hudson, 475 U.S. at 310. Further, defendants argue that the local union presumption is permissible and has been accepted by then District Judge Cabranes in Andrews v. Educ. Ass'n of Chesire, 653 F.Supp. 1373, 1377-78 (D.Conn), aff'd on other grounds, 829 F.2d 335 (2d Cir. 1987). While the issue was not raised when the Andrews case was appealed, defendants note that the Second Circuit subsequently upheld another union's use of the same kind of local presumption in Price v. Int'l Union, UAW, 927 F.2d 88, 93-94 (2d Cir. 1991).

This Court agrees with Andrews, 653 F.Supp. 1373, 1377

---

[11]Plaintiffs argue that CSEA uses its own chargeable percentage as the chargeable percentage for its local affiliates, on the assumption that the affiliates' chargeable percentage would be at least as high as CSEA's if an audit of the affiliate's spending were actually done.

(D.Conn.1987)[12] and finds that <u>Hudson</u> does not require that each local and district expenditure be audited by an independent audit.

> "There is little basis for the conclusion that every document made part of every disclosure process employed by every union is to be subjected to an independent audit, regardless of the size of the union and the circumstances under which it operates." <u>Id.</u> at 1377.

The <u>Andrews</u> Court further stated that: "When considering the disclosure provisions of the plan as a whole, this court cannot find, on the basis of one clause of one sentence of one footnote in <u>Hudson</u>, that the failure to provide an audit of the explanatory memorandum itself, or the failure to require an independent audit for the LEA's [the local union organization] expenditures renders the proposed system constitutionally deficient." <u>Id.</u> at 1377.

Furthermore, this court finds that the procedure used for determining agency fee percentages for the CSEA and their local counterparts is constitutionally permissible. The union uses the percentage of nonchargeable expenses for both the state and national organizations to determine the percentage of local and unit dues, which is not chargeable. Such a procedure has been held to meet the requirements of <u>Hudson</u>, and found to be constitutional. <u>See Andrews</u>, 653 F.Supp. at 1378. In <u>Andrews</u>, Judge Cabranes held that "defendants' use of the evidentiary presumption that the statewide figure is appropriate for the locals satisfies constitutional requirements ...." <u>Id.</u> Further Judge Cabranes found that this type of procedure resulted in a smaller fee assessment against nonunion members because it stated that national

---

[12]In <u>Andrews</u>, the Connecticut Education Association (CEA) used the chargeable percentage calculated for its statewide expenditures as the basis for determining the chargeable percentage of expenditures by CEA's local affiliates.

and state organizations spend a greater proportion of their funds on nonchargeable activities.

Consistent with its opinion, the Andrews court (quoting Hudson, 475 at 307 n. 18), stated that "the Supreme Court's repeated recognition that 'there are practical reasons why [a]bsolute precision in the calculation of the charge to nonmembers cannot be expected or required,'" and noted that "defendants' assumption appears reasonable, since local associations are much less likely to engage in extensive political and lobbying activities than the state and national organizations, and therefore, it is less likely that the moneys they receive from [nonmember objectors] will be used for those purposes." Id. (quoting Robinson v. State of New Jersey, 547 F.Supp. 1297, 1324 (D.N.J., 1982).

In the present case, CSEA uses a variety of methods to calculate the chargeable and nonchargeable percentages of each of its major categories of expenses when it annually mails its agency shop notice to its nonmember feepayers.[13] Based on the relevant case law of both the Supreme Court as well as this Circuit, unions such as the CSEA routinely calculate the chargeable percentage of their expenditures by employing a variety of inferences and assumptions designed to yield a close, approximation of the percentage of their expenditures allocated for chargeable activities in the fiscal year at issue. CSEA's technique of calculating the chargeable percentage of its expenditures on rebates to its local subdivisions is consistent with this approved procedure.

---

[13]For instance, expenses for administrative services are allocated not on the basis of any particular analysis of those departments' functions but rather on the basis of CSEA's overall allocation rate. The same rule is used to allocate CSEA's expenditures on "rebates" to the approximately 1,300 local unions and units that are CSEA's local affiliates. Moreover, expenses for the union's publications are allocated on the basis of a determination of the portions of the publications' content dealing with chargeable and nonchargeable issues.

Similar to the chargeable percentage of CSEA's expenses in its local units, the rebates are allocated between chargeable and nonchargeable categories by applying the chargeable percentage of CSEA's other expenses. This process yields a chargeable percentage for this category of expenses that understates this section and errs in favor of the feepayer. Accordingly, the local presumption is consistent with the law in this Circuit.

Moreover, CSEA's local affiliates and subdivisions are governed by a constitution, which absolutely prohibits them from making any expenditures relating to political or ideological activities. Thus, the local affiliates to which CSEA disburses the funds at issue spend none of the money for political or ideological purposes, which are at the heart of what is considered nonchargeable to objecting feepayers. In addition, in order for local affiliates to obtain a rebate from CSEA, the affiliate must file forms with CSEA proving that they have complied with annual reporting requirements and budgets mandated by the constitution and Code of Financial Standards.[14] The local affiliates are informed yearly of the chargeable and nonchargeable percentage that CSEA calculates for its other expenditures and they are expressly instructed to insure that the nonchargeable percentage of their expenditures do not exceed the statewide percentage. Further, to review for compliance with the nonchargeable percentage limitation, CSEA's Department of Internal Operations audits the local affiliates on a random basis and reports whenever inconsistencies appear in the budgeting and reporting forms

---

[14]CSEA requires that, in order to obtain their rebates, local affiliates file with CSEA their budget and expenditure reporting forms, demonstrating their compliance with these restrictions.

submitted by each affiliate to CSEA. In addition, CSEA's Statewide Treasurer also conducts training on financial requirements for the treasurers of CSEA's local subdivisions to ensure compliance.

This decision is consistent with Price v. Int'l Union, UAW, 927 F.2d 88 (2d Cir.1991) in determining whether the use of the local presumption is acceptable. Plaintiffs however, contend that Price "is not a precedent relevant to this case" because it involved a private-sector union and therefore was decided under the union's duty of fair representation pursuant to the National Labor Relations Act ("NLRA") rather than the First Amendment. See Plaintiff's 1/17/07 Memo at 5. Admittedly, Price did not squarely face the issue presented here. However, when considering the permissibility in general of a local presumption, this is a distinction without difference. Both Price, and this Court are guided by the Supreme Court's teaching in Hudson that "'[a]bsolute precision' in the calculation of the charge to nonmembers cannot be 'expected or required.'" See Hudson, 475 U.S. at 307 n.18.

Further, the Price court emphasized that the union's procedures challenged in that case, including the use of the local union presumption, were not just minimally sufficient to satisfy the union's duty of fair representation, but were "more than adequate" under that standard. See Price, 927 F.2d at 92.[15] Plaintiffs cite general language from the Second Circuit's Andrews decision to the effect that "excessive cost" could not be a reason for disregarding Hudson's requirements, see Andrews v. Educ. Ass'n of Chesire, 829 F.2d 335, 339 (2d Cir. 1987), from

---

[15]In fact, the Price court cited with approval then District Judge Cabranes' analysis in Andrews, 653 F.Supp. 1372 (D.Conn. 1987) of the local presumption issue under the First Amendment standard presented in Hudson. See Price, 927 F.2d at 94.

which they conclude that the Second Circuit would have reversed Judge Cabranes' holding regarding the local union presumption had that issue been appealed. <u>See</u> Plaintiff's 1/17/07 Memo at 4.[16]

Plaintiffs' arguments are misplaced. While the specific issue was not raised when the <u>Andrews</u> case was appealed, <u>see</u> 829 F.2d at 338 n. 1, the Second Circuit subsequently upheld another union's use of the same type of local presumption in <u>Price</u>. As stated above, while <u>Price</u> involved a private-sector union and raised the issue of the union's duty of fair representation under the NLRA as opposed to the First Amendment, the Second Circuit adopted the <u>Andrews</u> district court's reasoning in upholding the local union presumption under a First Amendment standard on the basis of <u>Hudson's</u> admonition that "absolute precision" in calculating the fee was not required. <u>Id.</u> at 94.

In short, the Second Circuit has upheld the use of the local union presumption. Consistent with this Circuit's holdings, this Court finds that CSEA has shown that, its use of the assumption that the chargeable percentage of expenses made by its local affiliates with rebates provided to them by CSEA will be at least as great as CSEA's overall chargeable percentage, is appropriate and reasonable.

**III. <u>CSEA's Organizing Efforts</u>**

The Supreme Court in <u>Lehnert v. Ferris Faculty Ass'n</u>, 500 U.S. 507, 519 (1991), articulated a three-part general test to determine whether an activity is constitutionally chargeable to objecting nonmembers:

[C]hargeable activities must (1) be "germane" to collective-

---

[16]According to plaintiffs, the Third, Sixth and Ninth Circuits have specifically rejected the local union presumption and this court must do the same. <u>See Hohe</u>, 956 F.2d at 399; <u>Lowary v. Lexington Local Bd. of Educ.</u>, 903 F.2d 422 (6th Cir. 1990); and <u>Prescott v. County of El Dorado</u>, 177 F.3d 1102, 1108 (9th Cir. 1999).

bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding "free riders;" and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop.

Plaintiffs contend that organizing cannot be germane to a union's collective-bargaining activity and challenge whether CSEA's efforts in organizing nonunionized employees in the same industry or market as its bargaining members, are germane to its collective bargaining function. Accordingly, plaintiffs asserts that CSEA's expenditures for organizing should be classified as nonchargeable rather than chargeable. See Plaintiff's 1/17/07 Memo at 9-11. Defendants argue that its expenses are entirely germane to CSEA's efforts to protect, through collective bargaining, the jobs, wages and benefits of the employees it already represents, and therefore, these expenses pass the test of chargeability. See Defendants' 2/2/07 Memo at 3.

### A.   Organizing under the Lehnert test.

Plaintiffs argue that they have shown that it is a *per se* constitutional rule that a public-sector union may not charge objecting nonmembers for organizing costs. See Plaintiffs 3/5/07 Oppo. at 16. Moreover, plaintiffs assert that under Lehnert, when a union's expense is not directly related to collective bargaining, contract administration or grievance adjustment, then it must show that the expense ultimately inures to the benefit of the local union members. See id. While plaintiffs are probation officers in the public sector, CSEA's organizing efforts focus primarily on organizing private-sector employees in the developmental disabilities field and in the food and courier services as well as temporary workers in the public sector not covered by a CBA.

Defendants claim that the nonunionized employees in all of these industries perform work similar to the work performed by CSEA's bargaining unit members and are competing with CSEA's bargaining unit members for employment opportunities in those industries. Plaintiffs argue that since they are probation officers, the employees in the developmental disabilities field and in the food and courier service industry are not in competition with them for employment opportunities.

The Supreme Court in <u>Lehnert</u> has held that non-members can be charged for their pro-rata share of costs associated with otherwise chargeable activities of state and national affiliates, even if those activities were not performed for the "direct benefit" of the objecting employees' bargaining unit. <u>See</u> <u>Lehnert</u>, 500 U.S. at 524. In so holding, the Court rejected the proposition that non-members may be charged only for those activities undertaken directly on behalf of their own bargaining units. <u>Id.</u> Such an approach, the Court noted, would "ignore the unified-membership structure under which many unions, including those here, operate." <u>Id.</u> <u>Lehnert</u> does state that there must be "some indication that the payment [to the National or State affiliates] is for services that may ultimately enure to the benefit of the members of the local union by virtue of their membership on the parent organization.... [however], the union need not demonstrate a direct and tangible impact upon the dissenting employee's unit." <u>Id.</u>

Plaintiffs urge this Court to construe this language to impose upon CSEA a burden to show that any expenses incurred (that are charged to plaintiffs) in connection with organizing the private and public sector bargaining units relating to employees in the developmental disabilities

23

field and in the food and courier service industry are only for activities that "ultimately inure to the benefit" of the public-sector employees, including the five plaintiffs who are probation officers employed by Monroe County. See Plaintiffs 3/5/07 Oppo. at 16. However, this language does not specifically impose such a burden since it specifically concerns the chargeability of state and national affiliation costs to local non-members. In addition, plaintiff's contention that CSEA's organizing efforts, which currently focus on the developmental disabilities industry, food and courier services as well as temporary workers in the public sector, provide no direct benefit to the members of the Monroe County probation officers, and thus are not chargeable, wholly ignores the Supreme Court's teaching in Lehnert.

The Lehnert Court rejected the very argument plaintiffs advance here that unions may charge feepayers only for those activities "undertaken directly on behalf of the bargaining unit to which the objecting employees belong." See Lehnert, 500 U.S. at 519. The Court reasoned that "[t]he essence of the affiliation relationship is the notion that the parent will bring to bear its often considerable economic, political, and informational resources when the local is in need of them. Consequently, that part of a local's affiliation fee which contributes to the pool of resources potentially available to the local is assessed for the bargaining unit's protection, *even if it is not actually expended on that unit in any particular membership year*." See id. at 523 (emphasis added). Accordingly, when the Lehnert test is applied to the facts of this case, plaintiffs contention fails because (as in the instant case), the dues and fees paid by members of

plaintiffs' bargaining unit contribute to a "pool of resources" that would be "potentially available" when and if that bargaining unit requires CSEA's organizing assistance.[17]

Further, even assuming the "some indication of ultimate benefit" test (see Lehnert, 500 U.S. at 524) should be expanded to the instant situation, we conclude that CSEA has made an adequate showing. According to Benjamin I. Gordon (Director of Organizing for the CSEA), over the past several years, CSEA's bargaining unit members[18] have faced increased threats to their job security and their wages and benefits due to efforts to contract out their work to non-union, private-sector employers in the same industry. Gordon Decl. at ¶¶ 5-6. Initially, CSEA chose not to take any formal action believing that the privatization would fail and that there would be no appreciable impact on the wages, benefits or employment opportunities of its members. Id. at 7-8. However, this assumption proved to be wrong since there has been a sizeable gap between the wages and benefits provided by non-unionized employers and those provided by unionized public-sector employers.[19] Thus, the impact on the employees represented by CSEA has been significant. For instance, the State of New York has threatened to transfer control of facilities operated by public-

---

[17]Plaintiff Stephany testified that there have been rumors about privatizing probation department jobs in Monroe County. See Deposition of Stephany at 13. If and when these rumors prove to be true, CSEA would be in a position to devote its resources to organizing such private-sector positions, to the benefit of plaintiffs' bargaining unit. Thus, the CSEA's use of its resources to organize competing private-sector employees "may ultimately inure to the benefit" of plaintiffs' bargaining unit. The Lehnert Court rejected the argument plaintiffs assert here. See Lehnert, 500 U.S. at 524.

[18]CSEA is the collective bargaining agent for over 200,000 employees in New York State. A majority of the employees represented by CSEA work in the public sector, including approximately 76,000 state government employees and 112,000 employed by local governments.

[19]In the developmental disabilities industry, for example, in which about 16,000 CSEA bargaining unit members are employed, private-sector employees (excess of 60,000 in number) receive an average of $15,000 less per year in wages and benefits than similarly situated employees in CSEA bargaining units.

sector employees in the developmental disability field to the lower cost, private sector employers. If that were to occur, the public sector job would be lost and replaced with a position that pays lower wages and provides fewer and higher cost benefits. Id. at ¶¶ 15-16.

Moreover, a similar impact has been felt by CSEA-represented employees in the food and courier industry working at facilities such as schools, hospitals and jails. Id. at ¶¶ 24-26.[20] In addition, the public-sector employers are transferring work to nonunioninzed employees within the public sector. Id. at ¶¶ 30-31. Accordingly, CSEA has seen public-sector employers try to replace many full-time positions with part-time work, with the impact being the substantial erosion of the wages, benefits and job security of those employees in the CSEA bargaining unit. Id. at ¶¶32-33.[21] Aside from threatening jobs, the presence of nonunionized employers in the industry has affected CSEA's ability to negotiate at the bargaining table. Thus, CSEA has shown "some indication" that expenses relating to the private sector bargaining unit "may ultimately inure to the benefit" of the members of the public sector unit. See Lehnert, 500 U.S. at 542. This Court finds that absent organizing, CSEA will forfeit "an effective bargaining tool" in its efforts to negotiate on behalf of the employees it already represents. See id. at 531.

Further, research in the field of labor economics as seen from Dr. Dale Belman's (defendants' expert witness) report, shows that "[a]s

---

[20]When the State contracted out these jobs to private-sector employers, the public-sector job was similarly lost and replaced with a position paying lower wages and providing fewer and higher cost benefits.

[21]To illustrate, at many school districts, temporary or part-time employees are not organized and their wages and benefits are significantly lower than those of CSEA-represented employees.

unions organize a greater proportion of the relevant economic market [i.e.., increased union density], they are able to improve their ability to negotiate increases in the compensation of those they represent." <u>See</u> Belman Report at 2, 7.  According to the report, this situation occurs because as unions increase density across an industry, the "employers' ability to substitute non-union for union labor" is reduced. <u>Id.</u> at 4. Consequently, as the wages of bargaining unit members increase, the "lower cost of [nonunioned] services is an incentive for privatization." <u>Id.</u> Dr. Belman further indicates that "[b]y organizing these [private-sector] services and bringing their wage and benefit package ... up to a level with those of similar public workers, public-sector unions lessen the cost savings from privatizing service[s] ... and increase their ability to bargain a more favorable wage package." <u>Id.</u> Therefore, research in the field of labor economic compels the conclusion, consistent with CSEA's experience and the undisputed evidence in the record, that organizing private-sector employers operating in the same competitive market as CSEA-represented bargaining units, is germane to protecting, through collective bargaining, the wages, benefits and working conditions of bargaining unit members.

**B.   <u>Ellis</u> is not the controlling test.**

Plaintiffs contend that the evidence presented by CSEA is irrelevant since the Supreme Court has previously ruled in <u>Ellis v. Brotherhood of Ry., Airline & Steamship Clerks</u>, 466 U.S. 435 (1984) that "organizing that is outside the bargaining unit cannot be charged to objecting nonmembers." <u>See</u> Plaintiff's 1/17/07 Memo at 8. In addition, plaintiffs assert that while <u>Ellis</u> is a Railway Labor Act ("RLA") case,

27

its holding is equally applicable to public-sector cases. See id. at 10. According to defendants, plaintiffs argument fails as a matter of law because Ellis was based specifically on the legislative history of the RLA and decided on the basis of very different facts. See Defendants 2/2/07 Memo at 12. This Court agrees that the factual underpinning and thus the context in which the expenses were incurred in Ellis are wholly different.

Specifically, the Ellis case rests on considerations specific to the legislative history of the RLA and the reason that Congress allowed unions governed by the RLA to collect an agency fee. See Ellis, 466 U.S. at 451-53. But, the RLA's legislative history has no bearing on whether CSEA's organizing expenses are constitutionally chargeable. Moreover, in determining the chargeability of specific expenses, the Lehnert Court did away with a formalistic categorization of chargeable and non-chargeable expenses, instead "prescrib[ing] a case-by-case analysis" of the expenditures in the contexts in which they were made and in light of the facts that confronted the union at the time of its decision. See Lehnert, 500 U.S. at 519. Such case-by-case analysis is proper here since the facts before the Court in Ellis concerning efforts to organize outside the bargaining unit and the legal governing body under which the expenditures were made, are different than those presented in this case. Consequently, given Ellis' specific focus on the RLA's legislative history and the type of organizing at issue, that decision is neither binding nor relevant to the chargeability question raised here. Thus, given the undisputed record that CSEA's ability to protect the jobs, wages and benefits of its covered employees through collective bargaining

depends on its organizing other employees working in the same industry, the union's organizing expenditures inure to the benefit of its bargaining unit members and thus are properly chargeable.

## IV.   **Agency Shop Notice for Period June 2005 to July 2006**

Four of the five plaintiffs, namely, Bergevin, Stephany, Swartzenberg and Zocco contend that their rights were violated because defendants failed to provide them copies of the 2005-2006 agency shop notice or any other type of notice following resignation of their union membership. See Plaintiff's 1/17/07 Memo at 13. The four plaintiffs argue that from June 2005 until July 2006, they were deprived of any of the information and procedural safeguards required by Hudson. See id. Therefore, plaintiffs claim that during this thirteen month period they had no opportunity to "gauge the propriety of the union's fee." See id.

Defendants explain that the four plaintiffs did not receive agency shop notices for the period 2005-2006 because they were still members of the union when those notices were mailed to all nonmember feepayers on May 10, 2005. See Defendants' 2/2/07 Memo at 23. The defendants also assert that the same four plaintiffs resigned their union membership in June 2005 and asked to be treated as agency fee objectors, which they were, for the 2005-2006 fiscal year. See id. Moreover, defendants argue that even if the union failed to provide plaintiffs with notices, the proper remedy would be to grant the employee an opportunity to object. See id.

I find that the plaintiffs cannot point to any harm they suffered by not having received the agency shop notice for period June 2005 to July 2006 particularly since it is undisputed that the notices were

mailed on May 10, 2005, a month before the four plaintiffs resigned from the union. Second, once plaintiffs resigned, CSEA treated them as agency fee objectors for the 2005-2006 period. Because the four plaintiff were already treated as objectors, they have suffered no injury which this Court could redress. Therefore, there was no defect in CSEA's <u>Hudson</u> notice and no basis for any damages or other relief to be awarded to plaintiffs.

<b><u>CONCLUSION</u></b>

For the reasons set forth above, I deny plaintiffs' motion for summary judgment and I grant defendants' motion for summary judgment dismissing plaintiffs' Complaint with prejudice.

ALL OF THE ABOVE IS SO ORDERED.

  s/Michael A. Telesca
  MICHAEL A. TELESCA
  United States District Judge


Dated:    Rochester, New York
          July 25, 2007